Hi, good morning ladies and gentlemen. We have six cases before the court today, only three of which are being argued. The other three have been submitted for the court's consideration on the briefs. The three that are being argued, of those three, we start with case number 152076 Schlumberger Technology Corp. v. United States, and I understand, Ms. Lee, that you want three minutes for rebuttal, is that correct? Okay, you may begin. May it please the court. In rejecting customs classification of the province, the trial court made three errors. Ms. Lee, would you agree that the common meaning of to shape is to give a mass a definite form? It's the desired form, Your Honor. It's a particular or proper form. That's the definition that was cited by the court, cited by both of the parties. The explanatory notes state that shaping is to form as nearly as possible to its desired form. The statute itself says fired after shaping, so it's just shaping, Your Honor. You argue on page 29 of your opening brief that the CIT improperly grafted a requirement under HTS US 6909 and 6914 that products entering under either heading be precisely shaped. Yes, Your Honor. In fact, that's one of the errors that I was about to point out, that the court failed to recognize that the province are shaped and, in fact, read into the definition of shaping the requirement for precision, because, again, the statute does not have such a requirement. The statute nearly says fired after shaping, focusing on the end result in the fact that the good is shaped, not had the method of shaping, which in this case happens to be agglomeration or granulation. But the variation is 100% variation. Are you saying that something can be shaped and it can be, but it doesn't, every single one can be shaped differently? Well, in fact, nothing in nature is the same. It's never exactly... Oh, the snowflake argument. I was going to say that's a philosophical argument. Well, in fact, though, it's like what's significant here is that Schlumberger actually has specifications. They created these specifications, so that's okay. They dictated that it was all right, you know, to have certain sizes, and, in fact, the industry that they serve wants those sizes, 20, 40, 40, 70. These are very small measurements. It's like, and so if you're looking at these very, very small province, it's like, and they are shaped in terms of Radisson sphericity, because they have the highest values on the Crumbine-Schloss chart. It's like those are very precisely shaped. So to have those specifications... If they're so precisely shaped, why do they have to sieve them? Sieving is not a shaping process. Sieving is nearly a sorting, a quality control, quality assurance process, and, in fact, Schlumberger is also... Sorting for what? For shape, or for size, or what? For size. Only for size. Well, it could be for shape as well, because, you know, in manufacturing processes, it is possible that, just like anything, something could be manufactured off-specification. So even a mug could have something that's a little bit off-spec. So it... If your argument is correct, is it the government's position that importation of pelletized iron ore across the Great Lakes is importation of ceramics? No, it's not, Your Honor. In fact, that's a very interesting point, because here we need to consider the entire process, the entire process of manufacture. So... I know how they make pelletized iron ore. I'll bet you do, Your Honor. I really do. And I'm not trying to say that, you know, iron ore is ceramic. No. In fact, what we're trying to say is that ceramic is... They agglomerate the ore, and they bake it before they ship it. But that should also be a preparatory step in order to extract the metal, or for transportation purposes. In this case, we have a ceramic, which is inorganic, non-metallic, shaped, and fired. And that's... Three of those things are undisputed. It's inorganic. It's not a metal. It has been fired. So the only question is whether or not it's been shaped. And when you have specifications like what Schlumberger has, they've specified these things. It's like, this is not just agglomeration randomly. There's... The briefing sort of confuses the standard of review a little bit, and tries to paint all of this as a pure question of law. There are certain components of classification that are factual determinations. So on the shaping point, in concluding that these particular products are not shaped, isn't that a factual conclusion to which we are supposed to give deference? There... In this particular case, the party stipulated to all the facts. So, Your Honor, no, we submit that that's... You have all the facts before you, which are stipulated. There are specifications. They are produced. Whether a product is shaped. Now, there's two different issues. One is how you define shaping under the classification, and the other is whether a particular product is shaped. And isn't the latter... I mean, the other side didn't stipulate that these were shaped, right? Correct. So why isn't that a factual determination? Well, Your Honor, again, it's like, you're correct in the first instance is a legal issue. What's the meaning of shaped? What's the meaning of shaped? We submit that the stipulated facts will demonstrate that it's, in fact, been met because of the specifications, because it's attained the highest level on the Crumb-Mein-Schloss chart. There is no value of one imperfect sphere on the Crumb-Mein-Schloss chart, or really anywhere. Even a machine ball bearing does not achieve one. So it's... At that point, it's like, Your Honors can take a look at the stipulated facts and apply those facts to what you deem to be the Unifying principle there is ceramic ware for technical use. So you have ceramics, wares, which are merely just articles, you know, or commodities or goods, manufactured articles, and then for technical use. Ceramic troughs, ceramic wares for laboratory chemical or other technical uses, tubs, pots, jars, similar articles of a kind used for the conveyance or packing of goods. Well, Your Honor, the... How does the subject matter? What, you know, as eudem generis, okay, what what's the unifying characteristic and how does the subject merchandise possess it? Well, Your Honor, we're looking at ceramic ware for technical use. So, and separated by semicolon, so this is this is what we should be looking at. The heading, all provide for ceramic articles that are used technically. And in fact, the trial court erred here in terms of failing to see that there are two named exemplars in the explanatory notes that are very similar to the problems that are issued here. The first is grinding balls. Grinding balls are very similar in the way they look and they can be very similarly manufactured. It's like, and that's in the record as well. What does the record tell us about the acceptable variation of shape for grinding balls? The acceptable variation? Right, so suppose the record said grinding balls are as, you know, as close as humanly possible to spheres that would roll smoothly. Then this wouldn't be so similar. What does the record tell us about grinding balls? The other one is, seems to me, pretty darn, this is the the little cylinders. What are they called? Oh, the ration rings. The ration rings. And those are those are shaped by any standards. But they, I'm curious about the grinding balls. I mean, are they like marbles? You could roll them perfectly smoothly. This is not like marbles. Grinding balls are used in a ball mill, right? Yes, correct. When a company orders grinding balls for its ball mill, are they ordering something that's exactly the same size? Your Honor, it's like, I'm not, I'm not, I'm not really familiar in terms of the sizing. It's like in versus province. Province have to be a very, very certain range. Not entirely sure about the range. But in terms of what they look like, and that's, that's in the record. There was a picture, I'm not sure if you, if Your Honor saw that. It's like, but they are round. The patents tell you that, you know, they're supposed to be spheroid, which it's basically spheres, and that they can be manufactured through a granulation disk, which is exactly what we have here. So in terms of those similarities, they're also packed in bulk, and they have, there's a lot of them that you, that you need to use at one time. So in terms of that, those are very similar. Do you, are you using the words wares and articles co-extensively? Wares, we, wares are our manufactured articles. Yes, that's our position. So they're both the same, so you don't differentiate between them? Not, no, not much, Your Honor, not at all. Okay, so given, given the size of these things, are you saying that one individual round piece is an article? Each, each, yes, but they are all, they must be used together. It's like, but that is not as relevant to the classification, only because it's like lots of things are them, like rashing rings, or grinding media, grinding balls. It's like, so that shouldn't, simply because you can't use one of them, that's, that doesn't, that doesn't, that doesn't take it out of the heading. And ceramic ware for technical uses, it's like, that's ceramic ware. If Your Honors feel that it's not a ware, it's like, then we would submit that it would be under ceramic articles of that same heading. It's like, again, because they are ceramic, inorganic, nonmetallic, shaped, and fired. But... Did you offer any evidence demonstrating to the extent to which dopants changed the chemical composition of the bauxite powder? The stipulated facts do state that, that the dopants are added for a specific reason. It's on page JA 129, where it lowers the firing temperature in order to assist in phase formation, to increase crush resistance of the final product. And they're not burned off. So if they're not burned off, and that's supposed to be in contrast to organic binders, so when you put it in the grinding, in the grinding disk, and I'm sorry, in the, in the, in the granulation disk, those binders, water, you know, other certain binders, they're burned off. So that's why we have an inorganic proponent at the end of the firing. But after firing, these dopants are not burned off. They remain in the product. Yeah. They remain in the product. You didn't answer my question, though. Do they change the chemical composition? It does change the chemical composition. Okay, where's that in the record? Our expert states that, but unfortunately I don't have it at my fingertips. I can look it up and give that to you when I come back. I thought it was agreed that the two particular dopants at issue here are found sometimes, I don't know how often, in the same kind of ore that is used here, but there is a, I think stipulation 53 says, a small addition of these dopants to the particular ore that is added here. Is that right? That's the stipulation. I don't know exactly how much, but the important part is that. Well, then let me tell you what I guess, and I'm not going to be able to ask this very precisely. I assume that the particular ore used here doesn't have as much of the two dopants as is desirable for the increased hardness and whatever, because they wouldn't be adding it otherwise. I assume, too, from the CIT's opinion, that some of the same kind of ore includes these two dopants. I mean, in fact, and you don't dispute that here. I'm interested in, I think, part of Judge Wallet's question is the extent to which those of the addition of the dopants, and in the same level of these dopants, either one, as results in this material from adding the dopants in the grinding milling process. Could you find this composition elsewhere in the ground? I don't know. That I don't know. Is it in order to achieve the correct chemistry? It's like, because these are naturally occurring, you will blend ores from various parts of a mine or from other sources in order to achieve the chemistry that you want. It's like, and, and so that's, that's how that happens, but I don't know, Your Honor, standing here, whether or not it's absolutely possible. But the explanatory note, that's where I think we're both driving, is the explanatory notes to 26 say that it may remain normal to the metallurgical industry so long as it does not alter the chemical composition of the basic compound. And if you're telling us you can mix ores from different veins and you come up with that composition, then it doesn't alter it. Except for, Your Honor, that this provision, Chapter 26, provides for aluminum ores. Just aluminum ores, raw material, except for it being prepared slightly so that it could be used for the extraction of aluminum metal. This is bauxite, right? This is not just bauxite for the province. It's bauxite plus the dopants. It's not naturally occurring, as Your Honor pointed out. But if you could find exactly the same mixture as, find in the ground, maybe by mixing two different veins, exactly what results from taking one vein and adding a dopant, then the material at issue, which is this result, is something that in fact you can find in the ground. Okay, the difference though, Your Honors, is that, is that when you, when I talk about mixing and mixing it and grinding it down into a powder, it's like that's a manufacturing step. That's not coming directly out of the ground. There's an artificial manufacturing step there. So you're not talking about just aluminum ore coming out of the ground, which is what we're talking about in terms of, you know, metallurgical, in terms of bauxite aluminum ore being used. The Chapter 26 stuff doesn't, doesn't remove from its, is that what we're talking about? We're talking about that the manufacturing process for the province contemplates what it, what it needs to do is grind everything down to a powder and then build it back up again into a spherical ball. It's like this. I'm sorry, let me, let me just, we may be on different pages here. Okay. Forget about Chapter 69 for purposes of this question. Think only about Chapter 26. Right. Chapter 26 doesn't care about grinding down to a fine powder, does it? Chapter 26 does not. Okay. It's not. Okay, you're way past your time. I'll give you two minutes for a rebuttal. Okay. Thank you. And we'll add two minutes to the council's time to the extent necessary. Good morning, Your Honors. May it please the Court, I'm Alex Shaffer from Coral and Warren for Shull and Berger. Your Honors, this crude granular substance doesn't belong in 6909 or indeed anywhere in Chapter 69 because it's not shaped. When... So, I mean, how do we, in some sense, ordinary English, in some sense it's shaped. Maybe not as shaped as other things. How do we answer that question? Well, a couple of ways, Your Honor. I think, and this was, this was sort of the debate that we had in the proceeding below as well. If I throw a piece of pottery on the floor and it breaks into shards, each of those shards has a shape. And my throwing it on the floor was the process by which we achieved that shape. Right, so there's more, there's more here. You want something within a certain range of shapes and you go through a process to get it into that range. That's different from whatever the heck results when you throw the pottery on the floor. Why is that not shaping just not as much as a teacup? I think that's because we're not talking about shaping in the abstract. We're talking about shaping for the purpose of ceramics and that's where I think the that was the court's intuition as well. When you're talking about shaping for ceramics, you're not talking about a shape that can deviate in its shape 30% the way a .9 on the Schloss Krumbein chart can. A russet potato is a .9 on the Schloss Krumbein chart. And you're not talking about a shape that can deviate in size by several hundred percent. I mean, I think it's worth noting that the size range that these propens come in already, within the range, allows for a hundred percent deviation. But the government's response to that is that that's by design, right? I mean, you allow it to have 100% deviation. You say as long as it's within this range, it can be a really broad range, but it's still got to be within a certain design. That's right, Joan, about that, of course. But the question there is whether it's a shaping process. We're not saying we don't have that. That specification isn't meaningful or that it's not significant for our use of the ultimate product. But that's a separate question from whether or not that represents a shaping process. And within the context of ceramics, and there's no shaping process that yields these sorts of divergent sizes and shapes. And all of the products that are listed in 6909 illustrate that. It's inconceivable that those products would be, you know, 30% deviation in size. The government's 30B6 witness referred to them as lumpy. Their experts said there's an oblong one. That one's kind of egg-shaped, but that one's got a flat edge. This is not characteristic. What does the record tell us about characteristics you're just describing, namely permissible variation in size or shape? My recollection, Your Honor, is that it's quite narrow. But I think the larger point is that grinding balls are made by a press or a mold. In other words, these are processes that are acknowledged to be shaping processes in the explanatory notes and in the ceramics industry. Lee said they were made by agglomeration. I'm not aware of grinding balls being made by agglomeration. I don't recall it. Because what you're saying is my understanding. I believe that's correct. They're molded. They're uniformly molded. Not least because their requirements for the surface consistency are more exact than what we have for our products. It appears to me that we might have two different potential classifications, neither of which are easy to fit within. And so the question is, with respect to your proposal, isn't it true that the manufacturing process that's used with respect to these propans makes it at least difficult, if not impossible, to extract usable aluminum metal from the bauxite? I think it does, but I want to be a little bit careful there, because the fact is, that becomes true the moment that you calcine bauxite. In the Joint Appendix, there's a discussion of the Baeyer process. It's kind of a two-step process that you use to extract alumina from bauxite. You first put it in a bath of sodium hydroxide. You then precipitate out the aluminum hydroxide, and then you cook it. But that initial step, the Baeyer process, that bath, isn't anything like the temperatures that we use to calcine the bauxite here. It's a couple of hundred degrees, I believe. Once you've calcined bauxite, it's rendered largely unsuitable for use for the extraction of metal, period. And yet, there's little doubt that calcined bauxite falls within 2606. The explanatory notes start off by saying it covers bauxite and calcined bauxite. We have refractory-grade calcined bauxite in there at the 10-digit level. None of those things are suitable for the extraction of aluminum. And so if the government's interpretation of the way that part of 226 works is correct, you have several headings that are effectively nullities. Talk a little bit about the doping addition. Well, Your Honor, the way I understand the doping is that you're essentially sweetening the wrong material. And I thought the idea of mixing ore from different veins was apt. It may be that in a particular batch, when you do the addition... I'll take it where I can get it, Your Honor. It may be that the initial batch, when you do the initial chemical analysis of what's in there, has sufficient quantities of those things that it's not required. Is there anything in the record that tells us about that, either way? I'm not sure what the record says about it. I know when we briefed it, we made that very point. We said there's no difference between a batch of ore that happens to have sufficient quantities of this stuff that you don't need to add them, and one that doesn't. And the government's never really come up with a satisfactory response to that. I'm sorry. Can you just... I just want to... What you just said is something more precise than what I'm remembering. What I remember is... I could be wrong about this, but Judge Stansel concluded, and you had argued, that by type of stuff in the post-dopant material, it's no different from what you can find in the ground. But I'm not remembering the point about the extent of the two dopants, which I guess we're not allowed to name, which makes it a little bit hard to talk about it here. But that the relative proportions, the amount of the dopant, would be found somewhere in the ground. Given that the relatively minute amounts that are added, admittedly I can't cite to a portion of the record that suggests this, but given the tiny quantities that are added, I'm not aware of any reason to think that you couldn't find the ore that has sufficient amounts of those. And that, of course, yields the workability problem, which Judge Stansel pointed out. To the extent that you conclude that that is a basis for, that that is a process that kicks you out of 26, it requires one to do the impossible and retroactively work out whether these things were added or whether there were insufficient quantities in the ore in the first instance. Did he find that one couldn't do it, or just you can't basically do it at the dock? He found that you can't do it at the dock. I'm not aware of any way that you could do it. His problem was, as you might expect, customs administrability. Since I have a little bit of time left, Your Honors, I wanted to talk a little bit more about 26. And it sets out, as we've discussed in our papers, a two-part test. It says you have to have a mineral of a mineralogical species used in the industry for the extraction of metal, even if it's intended for a non-metallurgical purpose, which we concede. And then it goes on to say that the headings don't cover minerals that normal to the metallurgical industry. But the government points out that the explanatory notes say that the processes must not alter the chemical composition of the basic compound, right? And they don't. Well, didn't even the court concede that they altered it in a slight way? Again, the court may have. I'd have to go back and look at the precise language that the court used. I think he said, quote, altered in a slight way the composition of the particular batch of the source ore. I'm not sure that that's accurate, though. It may have altered the relative proportion of ingredients in the source material. But I think, to me, that's different than altering the composition. The composition remains the same. I think, as a matter of pure chemistry, if you're talking about the addition of impurities or naturally occurring substances that are already there, I don't see that as a change to the composition. I see it as a change to the sweetening of the mix, if you will. And so, to my view, we tick both of the boxes that that note to chapter 26 sets out. There's no dispute that they're made of bauxite and that bauxite is, in fact, the ore used for the extraction of aluminum. And then the explanatory notes set out and explain what's meant by process is normal to the metallurgical industry. And it's as though they were looking at the manufacturing process for profits. They list, among other things, crushing, grinding, screening, agglomeration of powders into grains, balls, or briquettes, whether or not with the addition of small quantities of binders, drying, and calcination. Those are the self-same processes that we use, or that Chamberzé's PRC suppliers used, to manufacture the propensite issue. So you have the mineralogical species used for the extraction of metal, and you've subjected it to processes that are normal to the metallurgical industry. And we think that's entirely correct. That's what the lower court found, and it ought to be affirmed here. And the government argues that, you know, the firing that you all do actually affects a change in the crystalline structure, and that that goes beyond the kinds of examples of alterations that are deemed acceptable. Well, there again, that runs headlong into the calcination problem, because calcination affects the crystalline structure of the product as well. And, you know, and indeed we had the analysis that supported that. And so, once again, if you're going to accept the way that they want to circumscribe the chapter, then you're going to have headings that are devoid of content, because those operations have those same effects. And you haven't disputed here that the portion of the Chapter 69 definition that, or description, that talks about making something from a fine powder applies here. I'm sorry, Your Honor, I'm not sure I understand the question. So, if you look at XII-69-2 under shaping, the description, this is, I guess, the version that we're given doesn't really say, but I think it's in the general note, the manufacturing process that we're talking about in Paragraph A comprises the following, shaping, the prepared powder, etc. I was struck by the fact that one of your stipulations says that first you get particles up to 0.3 millimeters, and then by agglomeration, or whatever the other term is, what's the other term that's used as a synonym? Granulation. Granulation. You get particles that can be even smaller in size. If all the starting stuff was 0.3 millimeters, and by going through the granulation you get particles in smaller size, that doesn't sound like powder to me. But then there's another stipulation, 45 or something, that says it is powder, it's just that the individual particles in the powder can have this apparently very great range. So, you haven't disputed that even though some of the particles in the range can be larger than the product that you're trying to get out of it, that we're still within the powder restriction? Well, I think, here's what I would say about that, Your Honor. I think to the extent that there's a reference to powder, the milling of the powder is actually analogous to the granulation, in that it's a beneficiation step. In other words, it's a precursor to a shaping process. Now, when you have the fine powder, you're then going to use it with some sort of physical external constraint, a mold, or a press, or a die, or however it is that you're going to use it, to create the precise shape and the precise size that you want to make your lab ware, or whatever ceramic article you're looking to make. The difference here is, we don't have that subsequent step. We have the beneficiation process, analogous to the milling of the powder, the agglomeration of the granules, but that's it. There is no shaping process that takes place after that. And that's where I would see the distinction. Does that answer your question? I think enough, yeah. Thanks. That was all I wanted to get to, Your Honor. Thank you. Okay. Thank you, Your Honor. In order to attempt to answer your question, Judge Wallach, so there is a change in the chemistry once they're fired, because this is not simply a calcination process that occurs, because in this manufacturing process, there's a drying step, and then there's a firing step. And so the firing step is what transforms the aluminum oxide into a crystalline form of either corundum, or if it's got any sort of silica in it, it would be mullite, that sort of thing. So on JA540, our ceramics expert says that in the case of these propens, it's like once it's fired, you can't see these mineral phases containing, and I'm not going to say exactly what the elements are. So in terms of transforming, if there is a transformation, Dr. Carty goes through in his report, and I believe it's at JA574, 75, and also 79, where he explains that firing changes the composition. So not only does it drive off the water, but it also changes the composition. So there's the measured chemistry, but then it changes. Once you do a mineralogical analysis, you can see that there's a change. By 72, you mean the paragraph number on page 540? Yes. So JA540, I'm sorry, your honors. JA540, paragraph 72. So that's where Dr. Carty explains that there is a difference in the measured chemistry versus after it's been fired in the mineralogical structure. And he does explain how firing changes the inherent nature of aluminum oxides and all of the other elements and compounds. But we were asking, we were talking about dopants. So this is the difference in the chemistry. The dopants, what they do, and it's been stipulated, that it lowers the firing temperature to achieve crystalline phases. So it's a matter of economics, in fact, so that you don't have to raise the kiln to such a high temperature. So you lower the firing temperature to achieve these crystalline phases in order to meet Schlumberger's specifications on hardness, crush resistance. So what you're telling me is that it wouldn't be possible to find bauxite ore which would have that same content and which would do the same thing in the kiln at the various temperatures. Not that I know of, your honor. I mean, perhaps. I don't want to say never. But if they're blending it now, it's unlikely that you would find something exactly like that in nature and that you could just go ahead and manufacture it. They want certain properties. Schlumberger has these very specific specifications. You've got somebody in the audience who's nodding and it's very distracting. I apologize, your honor. I'm unaware of that. I assume it's one of your clients. Perhaps. I think your time is up. Okay, so thank you very much, your honors.